IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No.: 1:15-mj-250 |
| v. | ) | |
| | ) | |
| TUNISIA DAVIS, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Officer John C. Hardee, being duly sworn, depose and state as follows:

1. I entered on duty with the Security Protective Service (SPS) of the Central Intelligence Agency in April of 2011. Before joining the CIA, I served for almost eight years as a Metropolitan Police Officer in Washington, D.C. I graduated from the Metropolitan Police Academy.

2. This affidavit is being submitted in support of a criminal complaint charging TUNISIA DAVIS with a misdemeanor charge of forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with an officer of the United States Government while engaged in or on account of the performance of official duties, in violation of Title 18, United States Code, Section 111.

3. The facts and information contained in this affidavit are based upon my personal knowledge and observations during the course of this investigation, information conveyed to me by other individuals, including law enforcement officers, and my review of records, documents, and other physical evidence obtained during the investigation.

1

4. This affidavit contains information necessary to support probable cause and is not intended to include each and every fact and matter observed by me or known to the Government.

5. On Thursday, April 30, 2015, at approximately 1:20 p.m., I observed a vehicle approach the main gate to CIA Headquarters in McLean, Virginia, in the Eastern District of Virginia. I recognized the vehicle and driver from an earlier "Be On The Lookout" notice, or BOLO, from the National Security Agency (NSA). The BOLO stated that the defendant, TUNISIA DAVIS, had approached NSA earlier that day, and had told an officer there that "she wanted to see what they would do if she showed up." The BOLO also reported that the defendant claimed to be a former FBI Agent and said she planned to come next to CIA to test their security and to see what they would do. NSA advised the defendant not to approach any other U.S. Government facility and not to go to the CIA.

6. When she arrived at the gate, the defendant informed me that she was at the CIA to see an employee named "Jayne White." I directed the defendant to pull over to the curb and park her vehicle. The defendant did not pull over, even after I ordered her to stop. I began running towards the vehicle and another officer had to physically stand in the vehicle's path to get her to comply.

7. I subsequently directed the defendant to turn off her vehicle. She said "no," turned up the radio, and began dancing to the music. At one point, the defendant physically stood up, putting her upper body through the open sunroof, and began dancing on the driver's side seat. I directed the defendant to sit down, but she refused, saying that she had a medical condition. I directed her to sit down one or two more times before she finally complied.

8. After the defendant sat down, I observed the defendant reach for something in the storage area on the driver's side door. I could not see what the defendant was reaching for

because her hand had gone under an unfolded napkin that completely covered the storage area. I yelled for the defendant to stop reaching twice before she complied. I directed the defendant to put her hands on the steering wheel, and she responded by asking, "what are you going to do, shoot me?" She then made a quick movement, reaching under the driver's side seat, then showed me her hands and said words to the effect of "man, I don't have nothing." She next made a quick movement towards the glove compartment. I yelled at her to stop, and she leaned back into the seat.

9. I instructed the defendant to exit the car and handcuffed her. I informed her that she was not under arrest, but was being handcuffed for her and our safety. After the defendant confirmed that she still wanted to meet with Jayne White, I escorted her to an interview room.

10. During the course of the interview, I asked the defendant her name, date of birth, and address. The defendant responded that her name was Mahogny Shabaz, that she was born in December 1942, and that her address was 1600 Pennsylvania Avenue in Washington, D.C. The defendant did not have identification on her, but the NSA BOLO showed that the defendant was born in 1976, and that she has a Virginia address. CIA confirmed that the defendant was an FBI Special Agent from 2004 through 2010.

11. The defendant also informed me that she and her twin sister had earlier driven to NSA where they met an officer named Special Agent Juan Valdez. She claimed that her sister, TUNISIA DAVIS, owned the vehicle that she, the defendant, had driven to CIA. The defendant also claimed that Special Agent Juan Valdez had taken her driver's license. The BOLO from NSA only referenced TUNISIA DAVIS, and did not state that she had arrived with a sister. The defendant later changed her story; she claimed that she had not seen her sister in a long time, but said that they were able to communicate telepathically because they were twins.

12. CIA confirmed that neither the name TUNISIA DAVIS nor the name Mahogny Shabaz were on the CIA visitor access list.

13. After I made the decision to arrest the defendant for trespass, SPS Officer Lane began readjusting the handcuffs to prepare the defendant for transport. At the time, Officer Lane was kneeling, with her left side towards the defendant. Officer Lane's gun was holstered on her right side. The defendant said something along the lines of "oh, let me see this." She then reached with her free arm towards Officer Lane's gun belt. I grabbed the defendant's arm and told her not to reach for Officer Lane's weapon. The defendant responded that she wasn't grabbing for the weapon; she had wanted to see a book in Officer Lane's left pocket.

14. During her time in the interview room, the defendant made several disconcerting statements, including that three officers would be dead if she had wanted them to be. She yelled that she could have killed "all of you" and that the CIA "could be bombed." She also said President Obama was a terrorist.

15. When the defendant was being escorted to the patrol vehicle, she threw herself forward, as if she was trying to fall face first. The officers escorting the defendant managed to catch her before she fell to the ground. She then went limp, refusing to walk, and needed to be carried the rest of the way to the vehicle.

16. While the defendant was being transported to the detention center, she called the transporting officers "white bitches." She informed the officers that she wanted to die of police brutality, which is one of the reasons she came to the CIA. The defendant continually hit her head against the plexiglass window between the officers and the backseat. She threatened that if she could get an officer's gun, she would use it to kill everyone around her. She also said that she would strap a bomb on herself and "blow everyone up."

18. Based on the foregoing, I believe there is probable cause to conclude that on or about April 30, 2015, in the Eastern District of Virginia, TUNISIA DAVIS did forcibly assault, resist, oppose, impede, intimidate, or interfere with an officer of an agency of a branch of the United States Government while engaged in or on account of the performance of official duties, in violation of Title 18, United States Code, Section 111.

Officer John C. Hardee
Security Protective Service
Central Intelligence Agency

Sworn to and Subscribed before me
This 1st Day of May, 2015

/s/
Theresa Carroll Buchanan
United States Magistrate Judge
The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

Alexandria, Virginia